UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

FILED
U.S. DIST COURT
MIDDLE DIST. OF LA

2008 FEB 29  P 4: 04

UNITED STATES OF AMERICA

VERSUS

LARRY WRIGHT, JR.

CRIMINAL ACTION

NO. 06-150-JVP-CN

## RULING ON MOTIONS IN LIMINE

These matters are before the court on two motions to exclude expert testimony.  The government has filed motions to exclude the testimony of Dr. Darlene Nemeth ("Dr. Nemeth") (doc. 85), and Dr. Deborah Davis ("Dr. Davis") (doc. 90).  Defendant, Larry Wright, Jr. ("Wright") opposed the motions (docs. 91 & 93, respectively) and also filed a pretrial memorandum outlining Dr. Davis's proposed testimony and arguing its admissibility under Fed.R.Evid. 702.  An evidentiary hearing was held, and the government and Wright submitted post-hearing memoranda (docs. 109 & 110, respectively). These matters are now submitted and jurisdiction is based on 18 U.S.C. § 3231.

## FACTS AND PROCEDURAL HISTORY

On December 7, 2006, Wright was charged in a superseding indictment with three counts of illegal use of communications facilities, one count of attempted possession of cocaine with intent to distribute, and one count of possession of a firearm in furtherance of a drug trafficking crime (doc. 36).  The government alleges

1

that Wright, an East Baton Rouge Parish Sheriff's deputy, contacted an individual who, unknown to Wright, was a confidential informant for the Bureau of Alcohol, Tobacco, Firearms and Explosives.  Wright is alleged to have offered to protect the informant and arrange to have pending federal felony charges against him dropped in exchange for a sum of money and cocaine.  On June 21, 2006, Wright was arrested while allegedly meeting with the informant and attempting to take possession of money and cocaine.

The government alleges that, after his arrest, Wright was advised of his *Miranda* rights and taken to the Baton Rouge office of the Bureau of Alcohol, Tobacco and Firearms ("ATF") for debriefing by ATF Special Agent Michael Desmond and FBI Special Agents Kevin Kaufman and Matt Carter.  The government further alleges that, during the debriefing, Wright signed a waiver of his *Miranda* rights, and when presented with a written confession, made corrections to the statement, initialed them, and signed the document.

On October 10, 2006, Wright filed a motion to suppress the confession, contending that his statements were not freely and voluntarily given after a knowing and intelligent waiver of his constitutional rights (doc. 25).  The government opposed the motion (doc. 30), a hearing was held on February 2, 2007, and post hearing memoranda were filed by the government and defendant (docs 57 & 59, respectively).  The court denied the motion to suppress the statements,  concluding

that the waiver was knowingly and intelligently made and that the statements were freely and voluntarily given (doc. 63).

On June, 22, 2007, Wright served notice of his intent to introduce expert evidence relating to a mental disease or defect or other mental condition bearing on the issue of guilt (doc. 70).[1]  Attached to the notice was a copy of the expert report of Dr. Darlene Nemeth, Ph.D., a clinical psychologist (doc. 85-3).   The report presented the results of a psychological exam that Dr. Nemeth performed on Wright from April 20, 2007 to May 11, 2007 and concluded that "[t]he aforediscussed presentation appears to offer a clinical understanding of Mr. Wright's behavior on 6/21/06."

On December, 18, 2007, Wright served notice of his intent to introduce the expert testimony of Dr. Deborah Davis (doc. 86).[2]  Though no expert report was submitted, the notice described Dr. Davis as an expert in "police interrogation practices and false confessions." Wright subsequently filed a pretrial memorandum, which stated that Dr. Davis would testify that, contrary to common sense, people sometimes falsely confess.   She would also state factors that influence false

---

[1]The notice was issued pursuant to Federal Rules of Criminal Procedure 12.2(b), which provides that "[i]f a defendant intends to introduce expert evidence relating to a mental disease or defect or any other mental condition of the defendant bearing on . . . the issue of guilt . . ., the defendant must–within the time provided for filing a pretrial motion, or at any later time the court sets–notify an attorney for the government in writing of his intention and file a copy of the notice with the clerk.'

[2]Dr. Davis is a psychologist, employed at the Department of Psychology, University of Nevada, Reno.

confessions, note that certain suspects are more likely to falsely confess in certain situations, and address how to determine the likelihood of a false confession having actually occurred.[3]  The memorandum also stated that Dr. Davis would not testify as to the likelihood that a false confession occurred in the present case, but would testify that, "according to the research conducted in the field of false confessions, and given the circumstances of the interrogation and the susceptibility of Wright,  it is possible that Wright falsely confessed."[4]  (doc. 98, pp. 2-4).

On January 30, 2008, an evidentiary hearing was held, during which the court heard the testimony of Dr. Davis and Dr. Gina Mire ("Dr. Mire").[5]

## THE TESTIMONY

### DR. DEBORAH DAVIS

Dr. Davis testified that she had acquired her knowledge of interrogation techniques from reading about the techniques and from watching video of at least one hundred interrogations.  She also noted that she had not interviewed Wright or

---

[3]The memorandum, however, also stated that, "[i]t is the opinion of Dr. Davis and most other social psychologists involved in the field of false confessions that, except in rare cases, it is impossible for a false confession expert to determine with any high level of certainty whether any particular confession is actually false . . . ."  (doc. 98, p. 2).

[4]However, Dr. Davis admitted that she did not discuss the circumstances involving the confession with either Wright or the interrogating officers (tr., pp. 80-81).

[5]Dr. Mire was called by the government and testified that she is a clinical psychologist, currently employed as an assistant professor at the Tulane  School of Medicine in New Orleans. Dr. Nemeth was not present at the hearing but her expert report, diagnosing Wright with symptoms of Attention Deficit Disorder and with bipolar syndrome, was submitted..

his interrogators and did not "comprehensively" know the circumstances under which Wright made his confession.  (tr., pp. 17, 74, 80-82).

Dr. Davis stated that false confessions do occur, as is evidenced by the fact that suspects were found to have made false confessions in twenty-five percent of the 208 cases studied by the "Innocence Project."  She opined that mental health, particularly the ability to control oneself and one's thinking, is very relevant in determining how susceptible a given individual may be to making a false confession because interrogators try to control what the suspect thinks about.  (tr., pp. 24, 25, 40, 45).

She stated that "[i]nterrogators talk fast because that is more persuasive and "[t]hey'll pretty much always lie to you" (tr., pp. 45-47).  As an interrogator, "[y]ou have to torture them to the point - - I mean torture, in effect, by keeping them so long, making them so stressed out that they can't stand it anymore, or you have to convince them that it's in their self-interest to [confess].  One of those two things, essentially, is what is required to get a person to confess, you know, truly or falsely."  She stated that "[i]nterrogation is the biggest anti-*Miranda* warning that you could ever imagine, you know, that if you don't talk to me you are going to be so screwed, you know."  (*Id*. at 66-67).

When questioned regarding her use of statistics obtained from the "Innocence Project"[6] website, Dr. Davis admitted that she did not know how the "Innocence Project" chose the cases included in its study.  She stated that she merely cited the numbers to show that people do make false confessions.  She also stated that "we don't have what we need to - - you know, the information we need to establish a base rate of false confessions in the general population."  Moreover, when asked what studies supported her proposition that people with bipolar disease or A.D.H.D. are more susceptible to false confessions, she stated that no studies exist to demonstrate a statistical correlation between those with A.D.H.D. and false confession.  (tr., pp. 90-92).

Despite the question being repeated, Dr. Davis did not state whether any studies exist that demonstrate a statistical correlation between bipolar disorder and an increased incidence of false confessions.  However, she did state that, in her opinion, to begin to know whether bipolar disorder might influence a person to make a false confession, one would need to know more than a simple diagnosis of the disorder.  She stated that such an evaluation would require the evaluator to know specifically whether the person was in a manic or depressive state or somewhere in between at the time of the confession."  (tr., pp. 92-96).

---

[6]The "Innocence Project" is not a scientific study of anything. It consists of a group of lawyers who have gone around the country attempting to demonstrate that a number of people have been wrongfully convicted of crimes.  No effort has been made to validate that "false confessions" were made in any of those cases.

The following exchange between defense counsel and Dr. Davis is typical of

Dr. Davis' testimony at the evidentiary hearing:

Q        Is this theory of false confession generally accepted in the scientific
community?

A        Once again, we have to be real specific.  Are you saying the fact that false
confessions exist?

Q        And why.

A         Well, let's say yes, and I don't know.   First of all, among social
psychologists, absolutely.   The people who actually know the influence
literature and so on, absolutely.
          But some practicing clinicians are not as aware of it, let's say, as social
psychologists who have it in all kinds of introductory books and, you know,
have heard about it for years.
          The principles of influence are absolutely stunningly widely accepted.
They're in all the intro books, you know.  Part of it is who you're talking about,
because some people are not aware of these literatures, and other people
are.
          Also, the notion of, quote, the theory of false confessions, I don't exactly
know of a theory of false confession.   I mean, there's the fact that false
confessions do occur, and then there's our understanding of why, but it's
based on a lot of theory and research about decision making and influence.
It's not a theory.   It's different theories that all have relevant findings to
understanding why this phenomenon occurs.
          I don't know if that makes any sense to anybody but scientists, but it does.

(tr., pp. 60-61).

          In response to a question from the court, Dr. Davis conceded that there is no

scientifically reliable method of demonstrating that a confession is either true or false

(tr., p. 122).

In other words, Dr. Davis would offer the jury only testimony that supports the general proposition that sometimes a person does confess to a crime that he did not commit.

## LAW AND DISCUSSION

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the landmark case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, which provides that the court serves as a gatekeeper, ensuring that all scientific testimony is relevant and reliable.[7]   *See* 509 U.S. 579, 113, S.Ct. 2786, 125 L.Ed.2d 469 (1993).   Therefore, the district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can be applied to the facts in issue." *Id.* at 592-93.   Whether the reliability prong of the *Daubert* analysis applies to an expert's proposed testimony depends on the nature of the issue at hand, the witness's particular expertise, and the subject of the testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 1174-76, 143 L.Ed.2d 238 (1999). "Proposed testimony must be supported by appropriate validation– i.e., 'good

---

[7]Federal Rules of Evidence 702 provides:
> If scientific, technical, or otherwise specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

grounds,' based on what is known.   In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Daubert*, 509 U.S. at 590.

In *Watkins v. Telsmith, Inc.*, the Fifth Circuit stated, "[w]e conclude that whether an expert's testimony is based on 'scientific, technical or other specialized knowledge,' *Daubert* and Rule 702 demand that the district court evaluate the methods, analysis, and principles relied upon in reaching the opinion.  The court should ensure that the opinion comports with applicable professional standards outside the courtroom and that it 'will have a reliable basis in the knowledge and experience of [the] discipline.'"   121 F.3d 984, 991 (5th Cir. 1997) *(quoting Daubert*, 509 U.S. at 592).

In *Edmunds v. Illinois Central Gulf Railroad Co.*, the Fifth Circuit stated "[w]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." 910 F.2d 1284, 1287 (5th Cir. 1990) (*citing Viterbo v. Dow Chemical Co.*, 826 F.2d 420 (5th Cir. 1987)).  In *Viterbo*, the court noted that when an expert's "opinion is fundamentally unsupported, it offers no expert assistance to the jury.  Furthermore, its lack of reliable support may render it more prejudicial than probative, making it inadmissible under Fed.R.Evid. 403."[8] *Id.* at 422.

---

[8]Fed.R.Evid. 403 provides that   "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.  See also, *Holmes v. South Carolina*, 547 U.S. 319, 326, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (*citing* Fed.R.Evid. 403 and stating that "well-established rules

## Proposed **Testimony of Dr. Davis**

Defense counsel proposes to call Dr. Davis as an expert in "police interrogation practices and false confessions" (doc. 86). Dr. Davis' testimony, however, casts doubt on whether such a field is recognized in any scientific community. As noted *supra*, she stated that she is not aware of any theory of false confessions and her approach to the subject of false confessions is based more upon "different theories that all have relevant findings to understanding why this phenomenon occurs." She also mentions that she applies the principles of influence–something of which she indicates some practicing clinicians may not be aware.

Dr. Davis described the science upon which she seeks to base her testimony as, not a theory, but a variety of theories about decision making and influence that all have findings relevant to the phenomenon of false confessions. Using principles therefrom, she seeks to instruct the jury "how to determine the likelihood of a false confession having actually occurred" in the case at bar.

Defense counsel, however, has stated that "[i]t is the opinion of Dr. Davis and most other social psychologists involved in the field of false confessions that, except in rare cases, it is impossible for a false confession expert to determine with any high level of certainty whether any particular confession is actually false . . . ." Moreover,

_____

of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury).

Dr. Davis stated at the evidentiary hearing that no test exists that can determine the error rate of someone attempting to determine whether a confession is false."

The proposed testimony demonstrates significant shortcomings under Rule 702 of the Federal Rules of Evidence.  In the course of performing its gatekeeping function under *Daubert,* however, the court should also consider whether admission of the testimony is proper under Rule 403 of the Federal Rules of Evidence.  509 U.S. at 597.

For the reasons previously discussed, Dr. Davis' proposed testimony presents a very real danger of creating unfair prejudice, confusion of the issues, or misleading the jury, and particularly of creating undue delay and waste of time.

As previously noted, Dr. Davis would testify about false confessions in general without any direct reference to the confession before the court. As the Fifth Circuit has noted trial courts are not required to admit generic expert testimony.  *U.S. v. Dixon*, 2008 U.S. App. LEXIS 942 (5th Cir. 2008) unpublished.  There the court excluded generalized expert testimony very similar to that offered here by Dr. Davis.

The evidentiary hearing produced little, if any, information that would significantly assist the jury in the present case to determine any matter at issue. Based on the previous analysis, the court concludes that, under Federal Rules of Evidence 403, the proposed testimony of Dr. Deborah Davis is subject to exclusion because its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading of the jury, and waste of time.

11

**Proposed Testimony of Dr. Nemeth**

Defense counsel states that Dr. Nemeth will not be asked whether Wright made a false confession.  Instead, defense counsel proposes that Dr. Nemeth provide testimony that will track her expert report as to her mental health evaluation of Wright and his personality traits as revealed by the evaluation.  (*See* doc. 91, p. 1).

Dr. Nemeth is a licensed, practicing, clinical psychologist.  She has been practicing in Louisiana for several years as evidenced by the fact that she had previously seen Wright as a patient in 1997.  Her credentials as an expert in the field of clinical psychology have not been challenged and the court concludes that she is qualified on the basis of her knowledge, skill, experience and education to offer the proposed expert testimony.

Dr. Nemeth first saw Wright in 1997 when he was 16 years of age, because of problems with school.  She describes her course of examination and evaluation in the report.

Dr. Nemeth's expert report indicates that she performed a second comprehensive psychological evaluation over the course of five appointments from April 20, 2007 through May 11, 2007.  In the course of the evaluation she gathered extensive data using numerous examination and testing procedures.[9]    After

---

[9]Dr. Nemeth compiled data from Wright's previous records, an initial clinical interview, an Adolescent/Young Adult Life History Questionnaire, a Focus on Well Being Chart, the Wechsler Adult Intelligence Scale III, the Brown ADD Scales for Adults, the Test of Variables of Attention,

thoroughly reviewing the expert report, the court concludes that the proposed testimony of Dr. Nemeth is based upon sufficient facts or data to meet the criteria of *Daubert* and Rule 702.[10]

The court also concludes that the proposed testimony is the product of reliable principles and methods that are reliably applied to the facts of this case. Dr. Nemeth arrived at her results by applying standard, accepted psychological techniques to process the data.

The court also concludes that Dr. Nemeth's testimony will assist the jury to understand the evidence and determine facts in issue. Pursuant to Rule 12.2(b), defense counsel has provided notice that Dr. Nemeth's testimony will relate to a mental disease or defect or other mental condition of the defendant bearing on the issue of guilt. Dr. Nemeth's testimony will be relevant in that it may help the jury to understand Wright's mental health and personality traits. That understanding can then assist them in their determination of whether Wright possessed the *mens rea*

---

the Trail Making Test, Parts A & B, the Halstead Category Test, the Wide Range Achievement Test-Revision 3, the Rey 15 Item Test, the Test of Memory Malingering, the Symptom Checklist, the Multiscore Depression Inventory, the Personality Assessment Inventory, the Minnesota Multiphasic Personality Inventory, 2nd Edition, and the PsychEval Questionnaire.

[10]The government has argued that the data and facts upon which Dr. Nemeth bases her testimony is insufficient because Dr. Nemeth did not examine Wright regarding the circumstances surrounding the confession (doc. 91, p.1). As noted *supra*, however, Dr. Nemeth's proposed testimony will be limited to her diagnosis of Wright's mental health and the traits of his personality as revealed by her evaluation. She does not seek to opine whether the confession was false.

required to commit the charged offense and to determine whether he made a false confession[11].

Finally, the court concludes that the probative value of such testimony outweighs any danger that it might pose to create unfair prejudice, confuse the issues or mislead the jury.

**Testimony of Dr. Gina Mire**

Dr. Mire noted that Dr. Nemeth did not examine Wright at the time of his confession in June of 2006, but did so between April and May of 2007. Therefore, in Dr. Mire's opinion the diagnosis does not necessarily reflect Wright's mental state at the time of the confession. She noted that mental health, like physical health changes over time and stated that stress can exacerbate mental problems such as bipolar disorder. (tr., pp. 131-133).

Dr. Mire also noted that Dr. Nemeth had diagnosed Wright with attention deficit disorder in 1997, but her diagnosis in 2007 was attention deficit disorder N.O.S., which indicates that he had some symptoms of inattention or hyperactivity but they did not meet full criteria for a diagnosis of attention deficit disorder.[12] Based

---

[11]Though the diagnosis occurred several months after the confession, the court concludes that the diagnosis is relevant and notes that the jury may determine whether to consider this information in its determination of the facts at issue.

[12]According to Dr. Mire, "N.O.S" when appended to a diagnosis of attention deficit disorder stands for "not otherwise specified."

on the two diagnoses, Dr. Mire opined that his symptoms had improved since 1997. (tr., pp. 134-35, 144).

Dr. Mire also noted that Dr. Nemeth had not discussed or considered the symptoms that may have been present at the time of the confession.  She stated that, in order to determine whether a person was suffering from bipolar, and to determine the impact, if any, the condition might have on a confession, she would need to know "issues pertaining to their mood, whether they're on a manic episode or depressive episode, what level of severity of symptoms that they were experiencing at the time, because as we've heard, that can vary and may or may not impact at all a confession or a decision to confess."  (tr., p. 142-43)

Finally, counsel for the government noted that Dr. Nemeth's expert report stated "[t]he aforediscussed presentation appears to offer a clinical understanding of Mr. Wright's behavior on 6/21/06."  He then asked if, in Dr. Mire's opinion, Dr. Nemeth can offer a clinical understanding of Wright's behavior based on an evaluation done a year later.  "No," she replied. (tr., pp. 144-45).

The court concludes that these differences in expert opinion are matters for the jury to resolve.

## CONCLUSION

For the foregoing reasons, the motion by the government to exclude the testimony of Dr. Darlene Nemeth (doc. 85) is hereby **DENIED**, and the motion by the

15

government to exclude the testimony of Dr. Deborah Davis (doc. 90) is hereby GRANTED.

Baton Rouge, Louisiana, February 29, 2008.

JOHN V. PARKER
UNITED STATES DISTRICT JUDGE
MIDDLE DISTRICT OF LOUISIANA